IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DINA SCOPELLITI, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | 3:18-CV-40 |
| | : | (JUDGE MARIANI) |
| TRADITIONAL HOME HEALTH AND HOSPICE | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court for judgment is the retaliation claim of Plaintiff, Dina Scopelliti. Plaintiff, a former employee for Defendant Traditional Home Health and Hospice (hereinafter "Traditional"), initiated the above-captioned suit on January 5, 2018, and, in her Amended Complaint (Doc. 6), alleged interference in violation of the Family Medical Leave Act ("FMLA") (Count I), retaliation in violation of the FMLA (Count II) and "Disability Discrimination/ Failure to Accommodate/ Retaliation" in Violation of Americans with Disabilities Act ("ADA" or "ADAAA") (Count III).[1]

By way of Memorandum Opinion (Doc. 75) and Order (Doc. 76) issued June 2, 2020, the Court adopted Magistrate Judge Martin Carlson's Reports and Recommendations

---

[1] In April, 2018, Count I of Plaintiff's Amended Complaint was dismissed with prejudice by District Court Judge A. Richard Caputo, to whom this case was previously assigned. (*See* Docs. 13, 14).

(Docs. 63, 70), recommending that the parties' cross-motions for summary judgment be denied, and scheduled trial on Counts II and III of Plaintiff's Amended Complaint.

A four-day jury trial was held from October 12, 2021 to October 15, 2021. On October 15, 2021, the jury returned a verdict in favor of Defendant and against Plaintiff on her FMLA claim and ADA/ADAAA claims of discrimination and failure to accommodate. The jury also returned an advisory verdict in favor of Defendant on Plaintiff's ADA/ADAAA retaliation claim.[2]

While "findings by an advisory jury are not binding," *Wilson v. Prasse*, 463 F.2d 109, 116 (3d Cir. 1972) and "[a] trial court has full discretion to accept or reject the findings of an advisory jury", *Hayes v. Community General Osteopathic Hospital*, 940 F.2d 54, 57 (3d Cir. 1991), upon review of the evidence and testimony of record, the Court agrees with the jury that Plaintiff Scopelliti has failed to prove her ADA retaliation claim by a preponderance of the evidence. For the reasons set forth below, the Court will enter judgment on Plaintiff's retaliation claim in favor of Defendant, Traditional Home Health and Hospice, and against Plaintiff, Dina Scopelliti.

Pursuant to Fed. R. Civ. P. 52, requiring that "[i]n an action tried on the facts . . . with an advisory jury, the court must find the facts specially and state its conclusions of law separately," Fed. R. Civ. P. 52(a)(1), the Court sets forth herein its findings of fact and

---

[2] During the charge conference held on October 14, 2021, the parties agreed to have the jury render an advisory verdict on Plaintiff's ADA/ADAA retaliation claim.

2

conclusions of law supporting its determination that Plaintiff failed to prove her ADA retaliation claim by a preponderance of the evidence.

## II. ELEMENTS OF PROOF

The Court is bound by the same law in deciding Ms. Scopelliti's ADA retaliation claim as was the jury. Thus, to prevail on a claim for retaliation under the ADA, Plaintiff must prove by a preponderance of the evidence that (1) she requested a reasonable accommodation; (2) that she was subjected to a materially adverse action at the time, or after, the protected conduct took place, and (3) that there was a causal connection between her termination and her request for additional time-off, which she asserts was a reasonable accommodation.

## III. FINDINGS OF FACT

1. Plaintiff Dina Scopelliti worked at Traditional from May, 2014 until her termination on June 6, 2017. (Scopelliti Trial Test.).

2. Tammy Morano is the Human Resource Manager at Traditional. (Morano Trial Test.; see also, e.g., P-Ex. 1, P-Ex. 16).

3. Doreen Nixon is the Director of Nursing at Traditional. (Nixon Trial Test.).

4. Danyelle Guzzy is the Assistant Director of Nursing at Traditional. (Guzzy Trial Test.).

5. When she commenced working at Traditional, Ms. Scopelliti's biggest medical challenges were chronic migraines and lupus. (Scopelliti Trial Test.). During her job

interview for her position, she informed Traditional that she had diagnoses for both of these medical conditions. (*Id.*).

6. In December, 2014, Ms. Scopelliti was re-assigned to another position at Traditional after an incident with a co-worker. (Scopelliti Trial Test.; Nixon Trial Test.; Guzzy Trial Test.).

7. In January of 2015, Ms. Scopelliti requested that she be re-located to another office due to a fan blowing on her which aggravated her lupus. Traditional accommodated this request. (Scopelliti Trial Test.; Nixon Trial Test.; Guzzy Trial Test.).

8. Ms. Scopelliti did not have any problems with her requests for intermittent FMLA leave in 2015, on the basis of an FMLA form submitted by her neurologist. (Scopelliti Trial Test.; Nixon Trial Test.).

9. In 2016, Ms. Scopelliti again requested, and Traditional approved, intermittent FMLA leave. Scopelliti Trial Test.; Nixon Trial Test.).

10. On November 16, 2016, Ms. Scopelliti submitted a form to Traditional requesting time off for 8 "Upcoming MD appointments", on dates from November 21, 2016 through March 6, 2017. (P-Ex. 7). Kristi Green, Plaintiff's supervisor, signed the bottom of the form thereby approving these requests. (*see id.*; Test. of Scopelliti).

11. In March of 2017, Ms. Scopelliti had FMLA forms completed by several of her doctors and Traditional approved her requests for FMLA leave. (Scopelliti Trial Test.; Morano Trial Test.).

12. Beginning March 10, 2017, Ms. Scopelliti took FMLA leave to undergo two surgeries. (Scopelliti Trial Test.).

13. The "Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)" form, the first part of which was completed on or before March, 2017 by Tammy Morano, states that Ms. Scopelliti's "essential job functions" are "scheduling of hospice visits, data entry, insurance verifications." (P-Ex. 13; Scopelliti Trial Test.).

14. By letter dated April 21, 2017, Tammy Morano wrote to Ms. Scopelliti "confirm[ing] her] return to work as indicated in the physician certification completed by Dr. Horchos" which "stated [she] would be clear to return to work on a part time schedule effective May 4th, 2017." (P-Ex. 16). The letter further states:

> Upon your return to work, you will assume the position of Connections Program Coordinator. This position will require you to manage the Connections Program by scheduling and maintaining contact with all patients assigned to the program. You will be required to engage in regular report with the Hospice and Home Health management teams in order to initiate new patients into the program and to discuss potential referrals to the available services that the Agency offers. This is a full time position however your need to return to employment on a part time schedule will be acknowledged and respected until completion of your FMLA entitlement. This position will also entitle you to the same benefits, salary, and PTO as you had in your previous position and Traditional Home Health and Hospice. . .

(*Id.*).

15. Prior to taking her FMLA leave beginning in March, 2017, Ms. Scopelliti was an insurance verification specialist (also alternatively termed as an "intake specialist" and

5

"intake scheduler" several times at trial). She was aware that she could return to this position, rather than the position of Connections Program Coordinator as outlined in Ms. Morano's letter, if she preferred. (Scopelliti Trial Test.).

16. Ms. Morano believed the position of Connections Program Coordinator would be less stressful and would provide Ms. Scopelliti with more flexibility in her schedule. (Morano Trial Test.). Ms. Nixon also believed that the Connections Program Coordinator position was not as time sensitive as the intake specialist position and would allow Ms. Scopelliti to work from home if necessary, whereas the intake specialist position required the employee to always work from the office. (Nixon Trial Test.).

17. Ms. Scopelliti recognized that the new position offered to her was an accommodation. (Scopelliti Trial Test.).

18. On May 1, 2017, Ms. Scopelliti sent Tammy Morano and Danyelle Guzzy an email attaching an update to her FMLA form from her physician, which extended her leave until June 5, 2017. (P-Ex. 19; Scopelliti Trial Test.).

19. Ms. Scopelliti never returned to Traditional to work after she commenced her FMLA leave in March, 2017. (Scopelliti Trial Test.).

20. On the morning of June 5, 2017, Ms. Scopelliti called Ms. Guzzy, her supervisor, and informed her that she would not be at work that day. (Scopelliti Trial Test.). The following day, June 6, 2017, Ms. Scopelliti left Ms. Guzzy a "very short" message

stating that she would not be at work for the remainder of the week. (Scopelliti Trial Test.). Ms. Scopelliti did not mention anything to Ms. Guzzy in either phone call about medical issues, her doctors, her need for further FMLA leave or other leave, or that she needed these days off as an accommodation. (Scopelliti Trial Test.; Guzzy Trial Test.; *see also*, Morano Trial Test.). Ms. Scopelliti did not ask for the additional time off, but instead only told her employer that she was taking the time off. (Scopelliti Trial Test.; Guzzy Trial Test.).

21. In a letter dated June 6, 2017 written by Tammy Morano, Traditional terminated Ms. Scopelliti's employment "effective immediately". (P-Ex. 1; Morano Trial Test.). The letter further states that:

> You have been on a medical leave of absence since March 13, 2017. Your entitlement exhausted on June 2, 2017 at which time you were expected to return to work on June 5, 2017 to fulfill the duties of the full time Connections Coordinator position. This plan was reviewed in a letter sent to you on April 21, 2017. You did not return to work on June 5th as you called off ill on June 5th and June 6th on which date you said you would not be returning for the rest of the week.
>
> The Agency has acknowledged and respected your Family Medical Leave of Absence. The Agency, however, cannot hold the position open any longer. To do so would put the Connections program at risk as the management of the patients in this program require their oversight on a full time basis.
>
> . . . .
>
> We are sorry that your health status is preventing you from returning to work at the Agency. I did reach out to you via phone during the week of May 30, 2017 to discuss your return to work but was not successful in reaching you. . . .

(P-Ex. 1).

7

22. The letter was sent by Certified Mail on June 8, 2017. (P-Ex. 1, at 2).

23. On June 8, 2017, Ms. Scopelliti sent an email to Ms. Morano, Ms. Dixon, and Ms. Guzzy stating: "Effective 6/9/2017, I resign from my position at THHH". (D-Ex. 4; *see also*, Scopelliti Trial Test.; Morano Trial Test.). At this time, Ms. Scopelliti did not know that she had already been terminated. (Scopelliti Trial Test.).

24. Ms. Scopelliti learned that she had been terminated when she received a letter in the mail on June 9, 2017. (Scopelliti Trial Test.).

25. Traditional's termination of Ms. Scopelliti was a business decision. (Morano Trial Test.; Nixon Trial Test.).

26. During Ms. Scopelliti's FMLA leave from March to June of 2017, another woman was performing both Ms. Scopelliti's scheduling position and the Connections Program Coordinator position. (Morano Trial Test.; Nixon Trial Test.). At some time prior to June 5, 2017, this employee informed Traditional that she could not effectively continue to perform both positions and that she was overwhelmed. (Morano Trial Test.; Nixon Trial Test.).

27. Traditional needed to have one person in the intake specialist position and another person in the Connections Coordinator position. (Morano Trial Test.; Nixon Trial Test.).

28. Ms. Nixon explained that quick turn-around time is important for Traditional's business. (Nixon Trial Test.).

8

29. As of June 6, 2017, neither Ms. Morano nor Ms. Nixon knew if, or when, Ms. Scopelliti would be returning to work. (Morano Trial Test.; Nixon Trial Test.). Ms. Guzzy also testified that did not know whether Ms. Scopelliti intended to return to work the week of June 12, 2017 or thereafter. (Guzzy Trial Test.).

### IV. CONCLUSIONS OF LAW

1. Plaintiff did not prove by a preponderance of the evidence the first element of her ADA retaliation claim: that she engaged in a protected activity under the ADA. Although a "good faith request for an accommodation" constitutes protected activity under the ADA, see *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 190-191 (3d Cir. 2003), Plaintiff made no such request in this case.

2. The testimony at trial supports a finding that Plaintiff did not request an accommodation from Defendant when she telephoned Ms. Guzzy on June 5, 2017 to state that she would not be in the office that day, or on June 6, 2017, when she telephoned her Ms. Guzzy to tell her that she would not return to work that day or for the remainder of the week. The testimony of both Ms. Scopelliti and Ms. Guzzy show that it is undisputed that Plaintiff's telephone calls were brief and did not provide Traditional with any explanation for her decision to take additional time off, including informing Traditional that she was sick or that she needed additional time off from work due to a medical condition. There is also no evidence in the record that Plaintiff informed Defendant that she would actually be returning to the office on the following

Monday. The Court thus finds that Plaintiff never made a "request", much less a reasonable request, for an accommodation when she telephoned Traditional on June 5 and 6, 2017.

3. In addition, Plaintiff did not set forth sufficient evidence to show why, even if such a request was obliquely made, "that she had a reasonable, good faith belief that she was entitled to request the reasonable accommodation she requested", *i.e.*, additional time off following the expiration of her FMLA leave. *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004), superseded by statute on other grounds as recognized in *Robinson v. First State Cmty. Action Agency*, 920 F.3d 182 (3d Cir. 2019). Plaintiff was aware that her FMLA leave expired on June 2, 2017, and that she was expected to return to work on June 5, 2017. Although Plaintiff argued at trial that she was only asking for five additional days off, i.e., the week of June 5, 2017, the record does not support this argument. Rather, there is no evidence that Plaintiff informed Traditional that she actually planned to return to work the following Monday, June 12, 2017. The evidence only supports a finding that she informed Traditional that she would not be at work from June 5-9, 2017. Plaintiff has also not proven that she had a "reasonable, good faith belief" that she was entitled to request the additional time off where the record demonstrates that she resigned on Thursday, June 8, 2017, evidencing that her decision to take additional time-off from work was

"motivated by something other than a good faith belief that []she need[ed] an accommodation", *Shellenberger*, 318 F.3d at 191.

4. Having found that Plaintiff failed to prove the first element of her claim for retaliation under the ADA by a preponderance of the evidence, the Court need not engage in any further analysis. Nonetheless, the Court will briefly address the other two necessary elements a plaintiff must establish to prevail on her claim of retaliation.

5. The second element of an ADA retaliation claim requires that Plaintiff prove that she was subjected to a materially adverse action at the time, or after, the protected conduct took place. Put another way, Plaintiff must prove that her termination was serious enough that it well might have discouraged a reasonable worker from taking time-off from work beyond what the employer had previously granted. (*See* Jury Charge, Doc. 152, at 22).

6. Here, Ms. Scopelliti was terminated on June 6, 2017, which constitutes a materially adverse action. However, Ms. Scopelliti's telephone calls of June 5 and 6, 2017 to Ms. Guzzy were not requests for a reasonable accommodation as explained, *supra*. Because Ms. Scopelliti did not engage in any protected conduct, it cannot be said that her termination would discourage a reasonable worker from requesting a reasonable accommodation from Traditional, including time-off from work, to which he or she may have a legal entitlement under the ADA. Thus, the Court finds that Plaintiff failed to prove the second element of her ADA retaliation claim.

7. Similarly, where Plaintiff failed to prove the first element of the ADA retaliation claim, i.e. that she requested a reasonable accommodation, she necessarily failed to prove the third element: that there was a causal connection between any protected activity and her termination on June 6, 2017. There is undeniably a very close temporal proximity between the dates that Plaintiff called Traditional to inform her employer that she was not coming to work on June 5, June 6, or for the rest of the week, and her termination effective June 6, 2017. However, because Plaintiff's decision to not come back to work did not constitute a request for a reasonable accommodation or other protected activity, her termination on June 6, 2017 cannot be causally connected to her absence from the office for purposes of establishing her ADA retaliation claim.

8. Further, the Court finds that the Defendant's termination of Ms. Scopelliti was supported by evidence showing that it was taken for a legitimate cause and was not undertaken or otherwise tainted by discriminatory or retaliatory motive or intent.

9. Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Here, Plaintiff was granted this full period of leave and, when the 12 workweeks of leave expired on June 2, 2017, Plaintiff was aware of its expiration, and Traditional reasonably expected Ms. Scopelliti to return to

work on June 5, 2017. On June 5 and June 6, 2017, Plaintiff did not inform Traditional of any belief that she was entitled to any further leave under the FMLA or that she otherwise needed additional time off due to illness, medical reasons, or at a doctor's direction.

10. The Court credits the testimony of Ms. Morano and Ms. Nixon, both of whom convincingly explained that Ms. Scopelliti's termination was a business decision and necessary under the circumstances presented. Ms. Morano and Ms. Nixon both made clear that the position that Ms. Scopelliti held prior to taking leave in March of 2017, and the position she was offered of Connections Program Coordinator, needed to be performed by two separate people. Ms. Morano and Ms. Nixon both testified that the woman performing both positions in Ms. Scopelliti's absence was "overwhelmed" and could not continue doing so. One person attempting to operate in both positions was resulting in some tasks not being properly performed or being overlooked. Where quick turn-around time is critical to Traditional's business, the testimony at trial credibly established that Traditional believed it needed two people for the two separate positions and that the company was suffering, or would suffer, if the staffing issue was not resolved. Furthermore, the Court credits the testimony of Ms. Morano, Ms. Guzzy, and Ms. Nixon, each of whom testified that they did not know, as of June 6, 2017, if, or when, Ms. Scopelliti would be returning to work. Nor did Ms. Scopelliti testify that she had informed her employer as to when she planned

13

to return to work. Thus, Traditional's decision to terminate Ms. Scopelliti was legitimately based on a need to have two employees to perform the separate positions of Insurance Verification Specialist and Connections Program Coordinator. The administrators' opinions that one person indefinitely performing both positions, in light of Ms. Scopelliti's unspecified length of absence as of June 5, 2017, was causing, and would continue to cause, Traditional's business to suffer and put an untenable strain on one or more other employees, provides a strong and reasonable basis for Traditional's decision to terminate Plaintiff.

11. Finally, although not dispositive to this Court's determination, the Court notes that its finding that Traditional did not retaliate against Plaintiff in violation of the ADA, and its determination that Ms. Morano, Ms. Nixon, and Ms. Guzzy each provided credible and persuasive testimony, is supported by the evidence presented at trial as to other actions taken by Traditional over the time of Plaintiff's employment. Defendant was aware of Ms. Scopelliti's disabilities at the time she was hired, granted her intermittent FMLA leave in 2015 and 2016 and granted her the entire 12-workweek period of FMLA leave to which she was legally entitled from March to June of 2017. Traditional accommodated Ms. Scopelliti when she requested to move to a different office in 2015 due to the cold temperature in her then-office which aggravated her lupus. Traditional further made a number of attempts in March through April of 2017 to offer Ms. Scopelliti the Connections Program Coordinator position which would

14

allow her to work from home as needed, be more flexible, and be less stressful, a position which Ms. Scopelliti admitted constituted an accommodation for her.

12. Thus, upon consideration of the trial record and evidence presented at trial, Plaintiff did not prove by a preponderance of the evidence that Traditional retaliated against her under the ADA. The evidence further demonstrated that Defendant had a legitimate and non-discriminatory reason for terminating Ms. Scopelliti.

## V. CONCLUSION

For the foregoing reasons, the Court will enter judgment in favor of Defendant, Traditional Home Health and Hospice, and against Plaintiff, Dina Scopelliti, on Plaintiff's retaliation claim under the Americans with Disabilities Act. A separate entry of Judgment follows.

DATE: 11/22/21

Robert D. Mariani
United States District Judge